PULLMAN COMPANY *v.* DELIA E. KELLY,
AND
PULLMAN COMPANY *v.* JOSEPH KELLY.

TWO CASES.

1. SLEEPING CAR COMPANY. *Common carriers. Constitution* 1890, *sec.* 195. *Notice to passengers. Arrival at station.*

 Under Constitution 1890, sec. 195, declaring sleeping car companies common carriers, and subject to liability as such, it is their duty to notify passengers on their cars when they have reached their destination, and to afford them reasonable opportunity to alight.

2. DAMAGES. *Mental pain. Instruction.*

 Where punitive damages are not recoverable, an instruction is erroneous which authorizes the jury to award a plaintiff damages for mental pain, in the absence of evidence of physical injury.

3. SAME. *Absence of cross-appeal.*

 Nor can the error of such an instruction be escaped in the supreme court, in the absence of a cross-appeal by plaintiff, on the ground that the facts of the case warranted punitive damages, the court below having held to the contrary.

FROM the circuit court of Warren county.

HON. GEORGE ANDERSON, Judge.

Mrs. Kelly, the appellee therein, was plaintiff in one of the cases, suing in her individual right; and Joseph Kelly, the other appellee, an infant, suing by Mrs. Kelly, his mother, as his next friend, was plaintiff in the other case; the Pullman Company, appellant in both cases, was defendant in the court below in both cases.

From judgments in the plaintiffs' favor the defendant appealed to the supreme court.

On December 30, 1902, Mrs. Kelly, with her niece, about nine years old, and her son, Joseph Kelly, about three years old, took passage over the Alabama & Vicksburg Railway from Jackson to Vicksburg, Miss. They took seats in a Pullman sleeper, and paid for seats therein in addition to the regular railway fare. They reached Vicksburg some time after four o'clock P.M., and were carried by the station, but the train was stopped about a mile beyond the depot. Plaintiffs alleged in the declarations that when the train reached Vicksburg the car of the defendant company was so far back from the depot that they did not know they had reached their destination, and that they were not notified by any one that they had reached Vicksburg, and did not know it until the sleeping car conductor approached them after they had passed the depot and told them they had passed their station, when the train was stopped about a mile from the depot and they were put off in a strange part of the city, which was without police protection. The testimony for plaintiff tended to sustain these allegations. There were verdicts and judgments in two cases for plaintiffs, one in Mrs. Kelly's favor for $900 and one in Joseph Kelly's favor for $200.

*Dabney & McCabe,* for appellant.

1. A sleeping car company does not assume or undertake to transport passengers, and is under none of the obligations imposed by law upon carriers of passengers beyond its obligation

to render the services which, according to its peculiar business, it undertakes to render to its patrons.

2. The obligation of a carrier to notify its passengers, who are riding in the sleeping car, on approaching or reaching the station of their destination, is not upon the sleeping car company, but upon the railroad company which undertakes their transportation and assumes the obligation of such carrier.

3. If it is the duty of the conductor and porter of the sleeping car company to notify passengers before reaching stations, that duty rests upon them as agents and representatives of the railroad company, and not of the sleeping car company.

4. If the obligation rested upon the appellant company to give notice to its patrons, that duty was performed in this instance, and it was the negligence of Mrs. Kelly, or her mistake, when reaching Vicksburg in supposing that it was a suburban station and that there would be another stop in the city, which caused her to be carried by the station.

5. It was error to refuse the first, ninth, and tenth instructions asked on behalf of the defendant.

The duties of sleeping car companies are thus stated in vol. 25, p. 4, Am. & Eng. Ency. Law (2d ed.): "Sleeping car companies, by their invitation to passengers to occupy their cars, hold themselves out to the world as furnishing safe and comfortable cars, and when they sell a ticket there is an implied stipulation that their cars may be occupied with reasonable safety and comfort as sleeping cars. A passenger on a sleeping car has the right to expect those conveniences which are ordinarily furnished by such cars and for which he has paid, and there is an implied agreement on the part of the company that it will keep and furnish such supplies and conveniences as are usual and necessary to the health and comfort of the passengers."

In support of the text is cited *Campbell* v. *Pullman Co.,* 42 Fed. Rep., 484; *Lewis* v. *N. Y. Sleeping Car Co.,* 143 Mass.,

267 (s.c., 58 Am. St. Rep., 135) ; also *Nevin* v. *Pullman Co.,* 106 Ill., 222 (s.c., 46 Am. St. Rep., 688).

Again, same page: "A sleeping car company, by furnishing cars under a contract with a railroad company, to be used as sleeping cars by the traveling public, does not assume towards a person occupying its cars the relation of a carrier, nor undertake the duty of transporting the passengers to their destination, but the obligation which devolves upon it by the sale of a ticket is to grant the purchaser the privilege of sleeping in its car and of using the additional comforts and conveniences which it furnishes."

Again, p. 1112, *Ib.* : "A sleeping car company, by furnishing cars to be used as sleeping cars by the traveling public, under a contract with a railroad company, does not render itself liable for injuries received by a stranger through an accident connected with the movement of the train; *nor is it liable for the negligence or misconduct of those persons charged with the duty of operating the train of which the cars form a part."* (Italics ours.)

Again, *Ib.,* p. 1113: "They hold themselves out as furnishing safe and comfortable cars, with the implied stipulation that these cars may be occupied with reasonable safety and comfort *as sleeping cars.* By receiving pay for the use thereof they agree that they will exercise ordinary care to secure the comfort and safety of the passenger. On the part of these companies it furthermore impliedly agrees that all proper means within their power will be employed to preserve order in their sleeping cars during the journey, and especially during the sleeping hours, and that they will permit the passengers peaceably to occupy the berths and in no wise attempt to interfere with the proper enjoyment thereof."

In a very recent general digest, the U. S. Encyclopedia of Law and Procedure (called "Cyc."), we find the duties of sleeping car companies laid down as follows (vol. 6, p. 656): "One who has secured a berth, by purchasing a ticket or other-

wise paying therefor" (on sleeping cars), "is entitled to the accommodations for which he has contracted, and may recover damages if they are not furnished." Citing a number of cases in the note, p. 657, *Ib.*: "As the sleeping car company undertakes to furnish accommodations for the comfort of the passenger, it is under obligation to give him reasonably safe means for getting into and out of a berth and to respond to his reasonable calls for attention. The fact that the sleeping car company assumes to furnish accommodations for the passenger while asleep involves the duty, which is not imposed on a railroad company with reference to ordinary passengers, to awaken the occupant of a berth at night in reasonable time to get off at his destination."

We remark here that the reason why they are called on to awaken a passenger is so manifest and the distinction between that condition and the case of a day passenger in a parlor car is so marked that it hardly needs to be suggested. In some of the authorities which we will cite below it is clearly given. We simply remark that a day passenger who seeks the accommodations incident to a sleeping car is not expected to go to sleep, but is expected to be in full possession of all of his senses at all times, and no obligation is imposed upon the sleeping car company to arouse him from an unconscious state, as he is not expected to be in it, as is the case with a person asleep.

Again, *Ib.*, p. 658: "The railroad company is liable to a passenger for the wrongful acts or negligence of the servants in charge of a sleeping car, at least in the absence of any knowledge on the part of the passenger that the sleeping car is under separate management. *On the other hand* (italics ours), *the sleeping car company, not having undertaken the general duty of transporting the passenger, is not liable for the wrongful acts or negligence of the servants of the railroad company.*" Citing in support of this text *Pullman Co. v. Lee*, 49 Ill. App., 75; *Lawrence v. Pullman's Palace Car Co.*, 144 Mass., 1 (10 N. E.,

723; 59 Am. St. Rep., 58); *Paddock* v. *Atchison, etc., R. R. Co.,* 37 Fed. Rep., 841 (4 L. R. A., 231).

See also that they are not common carriers: *Pullman Co.* v. *Lowe,* 26 Am. St. Rep., 325, and notes; also Lewis, Am. Corp. Rep., 194, with notes; see also Elliott on Railroads, sec. 1616; Hutcheson on Carriers, 617d; *Ullrich* v. *N. Y. C. Ry.,* 15 N. E., 60.

We do not deny, of course, that sleeping car companies are liable for damages resulting from failure on their part to perform the duties imposed on them by law and their undertakings. We recognize that they must wake up passengers who sleep in their berths, to get off at their stations, and that they must provide them with all comforts and conveniences which they contract to furnish; but we deny that they are common carriers of passengers, so far as to assume the duties and obligations of a railroad company, which assumes the transportation of the passenger.

There are cases holding that sleeping car companies are liable for putting passengers off too soon, but this is an act in violation of their clear and manifest undertaking, and if it were not, it is an affirmative act to the injury of the passenger, which cannot be excused, and the question in such cases involved is entirely foreign to the one presented here.

It may be said that the constitution of Mississippi makes sleeping car companies common carriers. That provision of the constitution is sec. 195, as follows: "Express, telegraph, telephone, and sleeping car companies are declared common carriers in their respective lines of business, and subject to liability as such."

This does not impose any new or different obligations upon them than they were under previously. It does not make them carriers of passengers when they are not. It imposes upon them *liability* as common carriers "in their respective lines of business"—that is, they are liable as common carriers for breach of

the obligations which they assume in their business with the public and their patrons. No new duties or obligations are imposed on them by this constitution whatever. Hence, we think that the provision has no reference to or bearing on the question here involved.

But if we admit that the Pullman employes should give notice of the arrival of trains, and that they are accustomed to giving such notice, and that the law requires them to give such notice, we insist that the obligations arising are upon them as servants of the railroad company. A common carrier of passengers must properly discharge its passengers.

Sleeping car employes may be, and often are, the servants of the railroad company, and not of the sleeping car company, in respect to railroad company duties. *Higgins* v. *W. U. T. Co.,* 50 N. E. R., 500 (4 Am. Neg. Rep., 320); *Penna. Co.* v. *Roy,* 102 U. S., 451; *Thorpe* v. *N. Y. C. Ry. Co.,* 76 N. Y., 402; *Kingsley* v. *L. S., etc., R. R. Co.,* 125 Mass., 54 (s.c., 28 Am. Neg. Rep., 200); *Williams* v. *P. P. C. Co.,* 40 La. Am., 417; 33 Am. & Eng. R. R. Cas., 414; *Airey* v. *P. P. C. Co.,* 23 South. Rep., 512; *L. & N.* v. *Ray,* 46 S. W., 554; *R. R. Co.* v. *Walrath,* 38 Ohio St., 461 (43 Am. St. Rep., 433); *Dwinelle* v. *R. R. Co.,* 120 N. Y., 123 (17 Am. St. Rep., 614); *L. & N.* v. *Katzenberger,* 16 Lea, 380 (s.c., 57 Am. St. Rep., 235); *R. R. Co.* v. *Dies,* 91 Tenn., 177 (s.c., 30 Am. St. Rep., 871); *R. R. Co.* v. *Lipscomb,* 90 Va., 141.

It seems unnecessary to cite authorities on the proposition that the duty rests upon railroad companies to notify their passengers of arrival at the stations of their destination. They are numerous. We content ourselves with referring to a few Mississippi cases, there being quite a number, deeming it wholly unnecessary to refer to cases from other states. *So. Ry. Co.* v. *Kendrick,* 40 Miss., 374; *N. O., J. & G. N. R. R. Co.* v. *Statham,* 42 Miss., 607; *L., N. O. & T. R. R. Co.* v. *Mask,* 64 Miss., 738; *Dorrah* v. *I. C. R. R. Co.,* 65 Miss., 14.

*Smith, Hirsh & Landau,* on the same side.

According to appellee's own testimony she knew that she had gotten to Vicksburg, and supposed that it was a suburban stop, and the uncontradicted testimony is that abundant signals had been given from which any reasonable person ought to have inferred that it was Vicksburg. But she relied on her supposition and made no inquiry, sat still, and, in the face of all that passed at the time the train reached Vicksburg, made no inquiry, exhibited no interest in what was going on, but allowed the train to move out without doing or saying anything. She seems to have expected a personal warning to be given to her, and in her testimony above quoted puts her case entirely upon this ground that nothing was said to her about reaching Vicksburg and no one told her that she had reached Vicksburg. In the case of *Southern Railway Co.* v. *Kendrick,* 40 Miss., 374, this idea of appellee's is expressly condemned.

The court said: "They—*i. e.,* the passengers—are persons endowed with volition and capable of rational locomotion. They are not *delivered* to the keeping of the carrier, but of their own will make use of the vehicle as a means of conveyance, and take their seats for the purpose of being transported from one place to another, co-operating with him in accomplishing the end of the undertaking, which is to be safely carried to a given place, where it is presumed they will be careful to do what is necessary on their part to this purpose. A duty therefore devolves on the passenger, and it is to use reasonable care and diligence to leave the vehicle and to avail himself of the opportunity afforded him by the carrier to do so."

Further along the court uses this language in the same case—to wit: "All that is required of the carrier in such cases is reasonable warning, and such as may be presumed to be sufficient to give notice to those who are careful to do their duty. It would be unreasonable to require personal warning to each individual passenger, because it would require much time to do so in trains which are crowded with passengers; it would

cause much detention in traveling, which would be a public inconvenience, and it would be to impose a duty on conductors where there was a long train and many passengers which would require an extraordinary memory to perform properly, and which, therefore, would be often omitted through mistake or want of memory. It is better to require something to be done by the passenger; all that is required by the prevalent custom is that he shall use reasonable care and vigilance in attending to the business he has undertaken. If he fails to do this, he is chargeable with negligence which will preclude him of complaining that the carrier has not done his duty."

The plaintiff by her own testimony was relying upon the appellant's employes doing exactly what the supreme court in the Kendrick case has said they were not required to do.

The first instruction asked for by the appellee and granted by the court—to wit: "The court instructs the jury that if plaintiff were a passenger on defendant's car on or about the 27th or 30th of December, 1902, from Jackson, Mississippi, to Vicksburg, Mississippi, then it was the duty of the defendant's servants, agents, or employes to notify plaintiff before she reached Vicksburg, to give her ample notice that she was about to approach Vicksburg, and the failure to do so renders defendant liable to her for such damages as she has sustained, if any, from such failure"—is erroneous, and the second instruction repeats this error.

It is erroneous in that it imposes the duty upon defendant's employes to notify plaintiff before the train reaches the station.

In the case of *L., N. O. & T. R. R. Co.* v. *Maske,* 64 Miss., 744, the court uses this language: "No principles of law are better settled than that a railroad company carrying passengers in order to afford them opportunity to leave the train at their places of destination is bound to have the names of different stations announced *upon the arrival of the train,* and then to stop the train for a sufficient length of time for the passengers to get off with safety, and that a railroad company is liable for

the loss or injury which may result to a passenger for violation of this duty."

In the case of *Dorrah* v. *I. C. R. R. Co.*, 65 Miss., 15, the Maske case is quoted with approval, and the court uses this language: "It was obligatory on the railroad company to announce or give notice in some way of the name of the station *on the arrival* of the train at Madison station, and to stop the train long enough for appellant to get off with safety, and the company was liable for any loss or injury sustained by him on account of this not being done."

Again, the burden imposed by these two instructions was enhanced by using the word "ample." All the authorities say that it must be a reasonable notice. The word "ample" is defined in the Century Dictionary as "fully sufficient for any purpose, or for the purpose specified; abundant; liberal; plentiful. As, ample provision for the table."

"Reasonable" is defined by the same work as follows: "Characterized by the use of reason; amenable to reason or sound sense; not senseless and foolish or extravagant in thought or action; conformable to or required by reason; due to or resulting from good judgment; rational; sound; sensible; natural, etc. Not exceeding the bounds of reason or common sense; moderate; tolerable."

To say that ample notice must be given is to go beyond reasonable notice.

The second instruction is erroneous in that it authorized the jury to assess damages for mental suffering. There was no element of willfulness in the case, and the trial court so held.

The only theory upon which this instruction allowing mental suffering can be allowed is where there has been some bodily injury or the injury by which it is produced must be attended by circumstances of malice, insult, or oppression. *Dorrah* v. *I. C. R. R. Co.*, 65 Miss., 17.

The plaintiff was not made sick according to her own testimony, for she states that she was not sick at the time, but

suffered from the cold and inconvenience of it. The temperature was forty-nine degrees, as shown by the government weather bureau. She therefore suffered no physical injury. *Spade* v. *Lynn & Boston R. R. Co.,* 168 Mass., 285 (s.c., 60 Am. St. Rep., 393).

The case under consideration is singularly like the case of *Trigg* v. *St. L., K. C. & N. R. R. Co.,* 6 Am. & Eng. R. R. Cas., 349, cited with approval in the case of *Dorrah* v. *I. C. R. R.,* 65 Miss., 17.

*McLaurin & Thames,* and *Williams, May & Flowers,* for appellees in both cases.

This appeal presents one question of law and one of fact.

The question of law: Is it the duty of a sleeping car company carrying day passengers to notify its passengers of their arrival at stations?

The court below assumed, as a matter of law, that such a duty does rest upon the servants of a sleeping car company, and that the Pullman Company in the case at bar is liable for the negligence of its servants in this regard.

The question involved in the case at bar is not as to the liability for failure to wake a passenger in a berth, but is as to the duty of such company to advise passengers who are awake in their coaches as to their arrival at stations. While the defendant is a sleeping car company, it was not following its specialty at this particular time, but was engaged as a carrier of day passengers for hire.

Section 195 of our constitution is as follows: "Express, telegraph, telephone, and sleeping car companies are declared common carriers in their respective lines of business, and subject to liability as such."

If this section of the constitution means what it says, then a sleeping car company is to be governed in this regard by the rule which has been fixed for railroad companies. It does not appear from the said section of the constitution that sleeping

car companies are to be held to the liability of common carriers with respect to baggage only, but they are declared to be common carriers "in their respective lines of business." Their most important business is a passenger business. Their business is to care for passengers, and incidentally the baggage of their passengers. In this state, with respect to their "lines of business," they are to be held to the strict liability of common carriers. If this is true, if they are to be treated as common carriers of passengers, then there is no reason in a rule which would require greater care and attention from the servants of a railroad company to its passengers in its coaches than that required of the servants of a sleeping car company to the passengers in its coaches.

Is it the duty of the Pullman servants to brush people off before reaching their destination, to assist them in getting off, and yet not their duty to advise passengers in their coaches as to the place to get off?

Even appellant's counsel do not say, and on the trial appellant's witnesses did not say, that it is the duty of the railroad company's servants to announce stations in the Pullman cars. If it is nobody's duty to advise Pullman passengers who happen to be awake that they are approaching their destination, then how is such a passenger to travel through a strange land and in strange cities?

It will be noted that all of the cases cited by counsel for appellant in their brief which recognize any rule in conflict with that assumed by the trial court in the case at bar, treat the sleeping car company not as a common carrier.

The vice of all the argument upon the law of this case is that appellant overlooks or ignores the fact that a sleeping car company may be a carrier of waking passengers.

The peculiar and distinctive business of the appellant is to furnish accommodations for railroad passengers who desire, and will pay the extra compensation for, a place to sleep while being transported. Yet it is a fact with which all are ac-

quainted, and which may also be learned from the reading of this record, that passengers in Pullman cars do not sleep all the time. They have seats for use in the daytime, and these are converted into berths for use in the night time. Passengers do not always reach their destination in the daytime; they are not always asleep when approaching the station at which they expect to debark.

Appellant admits that a sleeping car company is liable for damages resulting from a failure to wake one who is asleep in a berth, thus permitting him to be carried beyond his destination. It is contended that this duty necessarily devolves upon the company under its contract; that the passenger must be waked in time to dress and prepare to debark at his destination.

But does it follow that the company owes no duty to the passenger who may be awake? Is the attention of the carrier due only to the sleeping passenger? Or to the passenger who may happen to be in a berth, whether he is asleep or not? If one occupying a berth should be carried beyond his destination because of a failure to call him in time, could the defense be made by the company that he was awake and could have looked out for himself?

When it is conceded that it is the duty of a sleeping car company to wake its berth passengers in time for them to prepare to get off at their destination, and that it is liable for a failure so to notify them, the reason upon which appellee's contention is grounded is conceded.

The passenger in a berth puts himself in the hands of a sleeping car company, as far as the internal management, care, and protection of that car are concerned. Whatever is to be done for him on the inside of that car, he expects the servants of the sleeping car company to do it. On the inside of that car the said servants are supreme. Inside of that car they are the sole and exclusive managers. He looks to them for what food, or drink, or comforts, or information is necessary to be obtained by travelers from carriers of passengers. The railroad

company has the train operated, but he looks to the servants of the latter company for nothing which is to be supplied on the inside of the Pullman car.

If it is not the duty of the railroad employes to announce the stations to their passengers in the Pullman cars who are asleep, or who are occupying berths, there is no reason in the contention that they should announce them for the benefit of those of their passengers who may be in the Pullman cars, but awake and not in berths.

If the servants of the railroad company are not required to call out the names of stations in the Pullman cars at night, there is no reason for requiring it of them in the day.

Informing a passenger that the train is approaching his destination is one act which is performed on the inside of the car by the servants of the carrier in charge of the car. It is performed by the same servants whose duty it is to protect the passenger, to make him comfortable, to see that he has food and drink, to look after his baggage. It is the duty of these same servants to show passengers where to get off, and to assist them off if necessary.

In the case at bar the defendant company was carrying passengers in its car for hire. Outside of the court it would doubtless resent any claim on the part of the railroad employes that it is their duty to go into the sleeping car and call out the stations. The railroad servants do not know who is awake nor who is asleep. They do not know whether there are Pullman passengers expecting to get off at a station. They know nothing of the "situation" on the inside of the Pullman car, and it is not a part of their duties to know anything.

Argued orally by *M. F. Smith,* and *Marye Dabney,* for appellant, and *J. N. Flowers,* for appellee.

Cox, J., delivered the opinion of the court.

These cases are practically identical ·in their facts. They were submitted and argued together, and will be decided to-

gether, as the determination of one legal question, which is common to both, will dispose of both.

We do not concur in the contention of counsel for appellant that a sleeping car company, not being a common carrier, is therefore under no duty to give any notice whatever to its day passengers that they are about to arrive at or have arrived at their destination. We would hold, even in the absence of a constitutional provision declaring sleeping car companies to be common carriers in their line of business and subject to liability as such, that a sleeping car company, having received a passenger in one of its cars, and given him, for a consideration, the right to occupy a seat therein between certain points, is under an implied obligation to give notice, if not by public announcement, then directly to him in person, that he has reached the end of his ride with them, which is presumably his destination. Certainly this must be the law when sec. 195 of the constitution is considered. If that section means anything, it can mean no less than that a sleeping car company owes to all passengers whom it receives all the obligations and duties which a common carrier owes to passengers, except, of course, that a sleeping car company, not controlling the motive power and not having the management of the train of which its car is a part, cannot be held liable to its passengers for injuries occurring to them by reason of any defect or failure in the machinery which furnishes the motive power, or by reason of any want of care, miscarriage, or default in the management of the train. It is settled beyond all controversy that a common carrier of passengers owes to them the duty of giving them notice when they have reached their destination, and of affording them reasonable opportunity to get off the car or other conveyance. By our constitution this duty is imposed upon sleeping car companies.

But these cases must be reversed because the jury were allowed to consider mental pain as an element of damage, and were not instructed as to the conditions under which damages

for mental pain are allowed, and because, in fact, an instruction was given which authorized them to allow damages for mental pain under conditions which do not warrant such damages under the law as announced in this state. An instruction was given for plaintiff in each· case (and in each case marked "Instruction No. 4"), which reads as follows: "The court instructs the jury that mental and physical pain are what is known as 'actual damages,' and that, if the jury find for plaintiff, it is their duty to take into consideration the mental and physical injury to the plaintiff, provided they believe from the evidence that she has suffered such mental or physical pain." The confounding of mental and physical pain with mental and physical injury, though the two are not necessarily the same, might, perhaps, be excused, if the jury ·had not been directed to take into consideration the mental and physical injury of the plaintiff, provided they find she sustained mental or physical ̓ pain. This would warrant damages for mental pain in the absence of any physical injury. We adhere to the rule that, in the absence of any physical injury, there can be no recovery for mental pain, except in a case in which punitive damages would be allowed. *Dorrah* v. *Railroad Co.,* 65 Miss., 14 (3 South. Rep., 36; 7 Am. St. Rep., 629).

If the jury had been elsewhere informed that there could be no recovery for mental pain unless there was also some physical injury to which the mental pain ·was in some way related, the error in instruction No. 4 might have been cured. But instruction No. 4 was incorrect and misleading, and the law was not elsewhere correctly stated. Upon any view of the case, the physical injury is not clearly shown. It may be that the jury, misled by instruction No. 4, awarded damages for mental pain, even though they may have found that there was no physical injury.

As to whether the wrong done appellee, Mrs. D. E. Kelly, and her infant son, Joseph, in failing to give her notice that she had reached her destination, and in carrying her, with two

young children—one of them sick—more than half a mile beyond her destination, putting her off the car upon the outskirts of a strange city, near sunset, on a cloudy winter evening, and leaving her, thus incumbered, to find her way to her friends as best she could, should not have been submitted to the jury, under proper instructions, as tending to show willfulness, wantonness, recklessness, or gross negligence, warranting punitive damages, we do not decide. Though this is earnestly pressed upon our consideration in brief of counsel for appellees, we cannot now pass upon it, because no such question is before us on this appeal, appellees not having taken a cross-appeal.

The court erred in granting instruction No. 4 in each case, and for this each case must be reversed.

*Reversed and remanded.*