MACON AND AUGUSTA RAILROAD COMPANY, plaintiff in error, *vs.* MOSES MAYES, defendant in error. •

Where a railroad company permits other companies or persons to exercises the franchise of running cars drawn by steam over its road, the company owning the road, and to which the law has entrusted the franchise, is liable for any injury done, as though the company owning the road were itself running the cars.

Corporations. Franchise. Railroads. Before Judge BARTLETT. Baldwin Superior Court. February Term, 1873.

Moses Mayes brought case against the Macon and Augusta Railroad Company for $20,000 00, damages alleged to have

been sustained by the plaintiff on account of the negligent conduct of the defendant in the running of its cars, by which he lost one of his legs. The defendant pleaded not guilty. The evidence made the following case:

George H. Hazlehurst was the president of the defendant, its chief engineer, and also a member of the firm of George G. Hull & Company, the contractors who were constructing the defendant's road. Whether the road had been entirely completed and formally turned over by the contractors to the defendant, the evidence was conflicting. William Printup was the superintendent of construction under George G. Hull & Company. The plaintiff was about twenty-four years of age. He was a hand employed in laying the track on the Macon and Augusta Railroad. J. W. DeBogan was the engineer of an engine employed by Hull & Company. On the day of the accident, the fireman on DeBogan's engine was sick, and the plaintiff was ordered by Printup to serve in that capacity. Mr. Hazlehurst was on the engine. As they went from Haddock's station towards Milledgeville, they heard a whistle which they thought was at the crossing. After "flagging" the first curve, DeBogan asked plaintiff if he heard anything down the road. He answered that he did not, and they went on. When they reached the crossing, De-Bogan blew his whistle. Plaintiff thought he intended to let him off to "flag" the second curve; thought he heard the engine, and asked DeBogan if he was going to "flag." DeBogan replied that he did not think it worth while. A hand on the engine suggested that the whistle which had been heard came from a train on the Eatonton road. Just as he asked De-Bogan about "flagging," he turned and saw the engine coming. The collision took place and plaintiff was injured to such an extent as necessitated the amputation of his leg. He received $1 25 per day for his labor. The defendant pays $1 85 per day for firemen.

The accident happened on December 1st, 1870, about one and a quarter miles from Milledgeville, in the direction of Macon. The night previous to the accident a dispatch was

sent to Frank Burnett, conductor on the Macon and Augusta Railroad, saying that a train would come up from Augusta going to Macon. Mr. Hazlehurst stated to DeBogan that he had received a dispatch from S. K. Johnson, superintendent of the Georgia Railroad, to the effect that the special train would leave Camak at 10:45 A. M. The collision took place at about 1:13 P. M. The distance from Camak to the place of collision is between forty-eight and forty-nine miles. DeBogan told Mr. Hazlehurst that they had better not proceed from Haddock. Hazlehurst directed him to go on and to "flag" the curves. He did not "flag" the last curve. He obeyed the instructions of Mr. Hazlehurst because he respected his authority as president of the road. He was put in charge of the construction engine at the request of Mr. Hazlehurst, and consequently felt grateful to him for the appointment; also obeyed him for this reason. He was discharged by Printup. He saw a dispatch from Johnson to Nesbit, agent of defendant at Milledgeville, on the evening before the collision. It was as follows: "A special train will leave Camak for Macon, at 11 o'clock. Suffer no train to pass Milledgeville." "Flagging" is a precaution used for the purpose of preventing collision between trains. A person is sent ahead of the engine, and when he discovers an approaching train he waves his flag, which causes the engine from which he has come to back; thus collisions are avoided.

The evidence was conflicting as to whether, if the second curve approached by the engine upon which plaintiff was, had been "flagged," a collision would have been prevented.

The train coming from Camak was an excursion train that ran at the instance of Hull & Company, the contractors. John P. King, president of the Georgia Railroad, S. K. Johnson, superintendent, Mr. Tyler, vice-president of defendant, and some other gentlemen, were on board. They were passing over the road by invitation—whether of Hull & Company or of Mr. Tyler, the testimony was conflicting.

The question upon which the case turned in the Supreme

Court, renders unnecessary any more comprehensive statement of the testimony.

The jury returned a verdict for the plaintiff for $3,500 00. The defendant moved for a new trial upon the following, among other grounds: Because the Court erred in charging the jury, "that if the defendant owned the road, and permitted the Georgia Railroad Company or Hull & Company to run cars thereon, then defendants are liable for all injuries resulting from the negligence or misconduct of the employees of said company so using their said road."

The motion was overruled and the defendant excepted.

GEORGE F. PIERCE; CRAWFORD & WILLIAMSON, for plaintiff in error.

W. A. LOFTON; DUDLEY M. DuBOSE, for defendant.

McCAY, Judge.

It is quite clear that the plaintiff, without fault of his own, has been badly hurt by a collision of trains on the defendant's railroad, caused by somebody's fault. It is scarcely less clear that the person most to blame for the collision was Mr. Hazlehurst himself, and that he is the president of the road. We think the verdict in this case is sustainable on several grounds. There is sufficient evidence of negligence in the speed with which the principal train was running to authorize the verdict. Over a new road, with no regular schedule, common sense indicates a speed far less than the proof shows for this train.

We think, too, the evidence that the tender and engine were making the trip under the direction of Mr. Hazlehurst, the president, justifies the jury in treating the company as the actual perpetrator of the negligence, notwithstanding it may be true that the construction company had not turned over either the engine or the road-bed to the company. But admitting all that is claimed—admitting that this engine and tender were under the control of Hull & Company—that Mr. Hazlehurst is to be looked upon in this transaction as one of the firm of Hull & Company, and not as president of the

Macon and Augusta Railroad Company *vs.* Mayes.

road, what, then, is the state of the case? An engine and tender, under the orders of Hull & Company, were running over the defendant's road. Hull & Company were exercising the franchise granted by the Legislature to the Macon and Augusta Railroad—were running a steam car and tender, and carrying passengers over the road of defendant through the country We are of the opinion that if this be so, third persons have a right to hold the railroad company responsible for any negligence of Hull & Company or their agents.

The running of cars drawn by steam through the country is a franchise, and unless granted by the Legislature, cannot legally be exercised. And if the railroad company to which the Legislature has granted this franchise permit others to use it, the company is responsible to the public for negligence of such persons. It is but a fair presumption that the Legislature, in granting such a franchise, looked to the capital of the company as a security that the franchise would not be abused. Upon any other view, the company might lease out its privileges to third persons, non-resident or not having property, so that the country would have no security against injuries done by the careless or even reckless use of the franchise.

In our judgment, if a railroad company sees fit to permit another person or corporation to run steam cars over its road, it is liable to third persons for damages caused by the negligence of such persons or corporations, just as though the company had itself been running the cars.

This is a new question here, and is to be decided rather upon principle than authority. It cannot, as it seems to us, be presumed that it was within the intent of the Legislature to grant to this corporation this extraordinary privilege of flying through the country, across the public roads, puffing and screaming and rattling so as to disturb the public quiet, and force everybody to get out of their way, with the additional privilege of turning the right over to any other person at its pleasure.

We are clear that the capital to be invested and the corporation created, are to be held responsible for the misuse of the

franchise, no matter by whom it is done. The corporation cannot thus escape the obligations implied in its acceptance of the charter. The charter is a contract between the company and the public, and as it is the right of the company to demand that the Courts shall protect it against the infringement of its rights by the public, so it is the duty of the Courts to protect the public against the misuse of its franchise by the company.

Mr. Pierce, in his American Railroad Law, gives, as the result of the authorities, the rule we have now laid down in reference to the exercise of the right of eminent domain by the contractors for a corporation : See American Railroad Law, 239, and the cases cited.

In the case of Beman vs. Rufford, 1 Simon (N. S.,) 550, and the case of Winch vs. B. and L. R. Co., 13 L. and E., 506, it was held that it was not within the power of a railroad company to lease out to a third party its corporate franchise of running cars, and in the case of the York and Maryland L. Railroad vs. Winans, 17 Howard 39, the Supreme Court of the United States decided that a corporation cannot so turn over its franchise to another corporation as to escape an action of tort for a misuse of the franchise. In that case, Judge CAMPBELL says: "Important franchises were conferred upon the corporation to enable it to provide the facilities for communication and intercourse required for the public convenience. Corporate management and control over these were prescribed, and corporate responsibility for their insufficiency provided as a remuneration for their grant. The corporation cannot absolve itself from the performance of its obligations without the consent of the Legislature." In that case, the action was by the owner of a patent against the company for infringement of the patentee's rights in the use of certain cars. The company owning the road and having the franchise was not running cars, but another company. That case is not nearly so strong as this. Here Hull & Company were using the franchise of running steam cars through the country, across the public roads and by the side of them—an act which is a nuisance unless by Legislative grant, and in the doing of this

the damages came to the plaintiff.   If the engine and tender were, at the time, under the orders of the president of the road, the case is clear.   If under the orders of Hull & Company it was by the consent or permission of the company, and the case stands upon the rule we have discussed.   We put the case, in this view, upon the ground that the use of the engine and tender for the purpose set forth in the record, to-wit : to pass over the road with steam cars, from point to point, for the purpose of carrying Mr. Hazlehurst, was a use of the franchise of operating the railroad by steam, and that the corporation is liable, no matter who did it.   The case might be different if the contractors were in the prosecution of their proper work, as moving dirt, etc., under circumstances, when they were not exercising the franchise of the company in operating the railroad by steam cars, so as to do that which, without the franchise, would be a nuisance.

For these reasons we affirm the judgment.